IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALBERT MITCHELL, | ) | Civil Action No. 12-165 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF PITTSBURGH, *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

## I. Introduction

Pursuant to Title VII, 42 U.S.C. §§ 2000e–2000e-17, the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634, and the Pennsylvania Human Relations Act, 43 PA. STAT. §§ 951–963, plaintiff Albert Mitchell ("plaintiff" or "Mitchell"), a sixty-one-year-old African-American male, brought claims of race and age discrimination against his former employer, the City of Pittsburgh ("City"). Plaintiff also brought claims under 42 U.S.C. § 1983 against certain City employees, i.e., the director of the Public Safety Department of the City of Pittsburgh, Michael Huss ("Huss"); the chief of Emergency Medical Services ("EMS"), Robert McCaughan ("McCaughan"); the deputy chief of EMS, Mark Bocian ("Bocian"); and the director of the Office of Municipal Investigations ("OMI"), Kathy Kraus ("Kraus") (collectively with the City, "defendants"). Plaintiff alleges that the City unlawfully discriminated against him when it terminated his employment with EMS. On May 29, 2013, defendants filed a motion for summary judgment (ECF No.

1

25), which is the subject of the instant memorandum opinion. For the reasons that follow, this motion will be granted in part and denied in part.

## II. Factual Background

### A. Mitchell's Employment with the City

The City hired Mitchell on June 5, 1978. (Combined Concise Statement of Material Facts ("CCS") ¶ P1, ECF No. 57.) Mitchell was hired as a paramedic for the City's EMS division. (Id.) In 1996, Mitchell was promoted to EMS crew chief. (Id. ¶ P4.) Mitchell's role as a crew chief was to lead a team of two or three paramedics. (Id.) Until the incident discussed below, Mitchell had no disciplinary history of inappropriate sexual conduct. (Id. ¶ P9.)

### B. The Incident of February 14, 2010

On the morning of February 14, 2010, Mitchell and his partner, Chris Harding ("Harding"), were dispatched to the home of an older woman ("patient") who complained of breathing problems. (Id. ¶¶ D2, D3, P17.) Mitchell and Harding transported the patient to Magee-Womens Hospital ("Magee"). (Id. ¶¶ D4, P19.)

Upon arrival at Magee, Mitchell and Harding were instructed to take the patient to a room assigned by Magee staff. (Id. ¶ P20.) At that point, Mitchell and Harding were met by Magee nurses Laura Witt ("Witt") and Amanda Conroy ("Conroy"[1]) and Dr. Renu Garg ("Garg") in the assigned room. (Id. ¶¶ D6, P21.) Their next step was to transfer the patient from the EMS stretcher to the hospital

---

[1] Since the date of the alleged incident, Conroy has married and now uses the last name of Andredas, but will be referred to herein as "Conroy." (CCS ¶ P21.)

bed. Witt and Mitchell were on one side of the bed, and Conroy, Garg, and Harding were positioned at various points around the stretcher. (Id. ¶¶ D7, P24.)

Mitchell contends that, as he moved to transfer the patient, Witt walked in front of him. (Id. ¶ P24.) Mitchell said "I got this," and when Witt did not respond, Mitchell put his hands on her waist area and moved her to the foot of the bed. (Id.) Witt stated, however, that as the patient was about to be moved, Mitchell walked up behind her and brushed up against her, which took her by surprise. (Id. ¶ D8.) Witt stated that seconds later Mitchell grabbed her buttocks, and placed his fingers "very close to [her] private area." (Id. ¶ D9.) Witt stated she objected immediately, and Mitchell responded: "That was for Valentine's Day, they call me walking chocolate." (CCS ¶ D10.) Mitchell denies touching Witt in this way, and denies saying anything about "Valentine's Day" or "walking chocolate." (Pl.'s App., Ex. 12 ("Mitchell Dep.") at 71:1–11, ECF No. 46.)

Later that day, Witt reported the alleged incident to her supervisor, Jeffrey Hodges ("Hodges"), via email. (CCS ¶ D16.) Hodges forwarded Witt's email to EMS Chief McCaughan, who started the City's investigative process discussed below. (Id. ¶ D17.)

### C. The City's Investigation of the Incident and Mitchell's Termination

After McCaughan received Witt's email on February 16, 2010, the complaint was referred to OMI, specifically OMI director Kraus, for further investigation into the alleged incident. (Id. ¶¶ D17, P31.) Kraus assigned the OMI investigation to OMI detective Heather Bristow ("Bristow"). (Id. ¶ D19.) On February 17, 2010, EMS

Deputy Chief Bocian notified Mitchell that an investigation was underway with respect to the alleged incident that took place on February 14, 2010. (Id. ¶ D18.)

### 1. Criminal Investigation

Bristow, based on her prior experiences, believed that the complaint was of a criminal nature, and consulted with Allegheny County Deputy District Attorney Janet Necessary ("Necessary"). (Id. ¶ D20.) After Bristow's consultation with Necessary, Bristow informed Kraus about the conversation she had with Necessary. (Id. ¶ 21.) Kraus decided to refer the complaint to Commander Thomas Stangrecki ("Stangrecki") of the City of Pittsburgh Police Sexual Assault Unit to see if criminal charges would be brought against Mitchell. Stangrecki assigned the case to Detective Noelle Campbell ("Campbell"). (Id. ¶¶ D22, P30.) Kraus testified that she generally refers complaints of sexual assault to the sexual assault unit. Mitchell argues to the contrary that it is not a routine practice and points to Kraus's testimony that she only sent four or five cases to the sexual assault unit. (Pl.'s App., Ex. 8 ("Kraus Dep."), at 32:6–8, 36:4–9, ECF No. 43.)

On February 18, 2010, as part of her investigation into possible criminal charges, Campbell interviewed Witt via telephone about the alleged incident. (CCS ¶¶ D24, P45.) Campbell interviewed Garg, Harding, and Mitchell via telephone. (Id. ¶ D25.) Garg and Harding reported that they did not see Mitchell inappropriately touch Witt. (Id. ¶¶ D26, P59.) Campbell testified that Harding said he heard Mitchell say something about "Valentine's Day" and "dark chocolate." (Id. ¶ D26.) Harding, however, denied ever recounting these statements to Campbell, and

denied ever hearing Mitchell make these statements. (Pl.'s App., Ex. 6 ("Harding Dep."), at 66–72, ECF No. 41.) Witt did not wish to pursue criminal charges against Mitchell; therefore, no criminal charges were filed, and the criminal investigation was closed. (<u>Id.</u> ¶ D27.)

## 2. Disciplinary Investigation

Even though the criminal investigation had concluded, Bristow's investigation for OMI continued. (<u>Id.</u> ¶ D28.) Bristow interviewed Garg, Conroy, and Witt via telephone. (<u>Id.</u> ¶¶ D28, P52.) Bristow interviewed Mitchell in person and tape-recorded the interview. (<u>Id.</u>) Harding was not interviewed by Bristow because he had been activated to military duty and the case was closed when he returned. (<u>Id.</u> ¶ D28.) OMI investigations can be kept open, however, if an important witness is unavailable. (<u>Id.</u> ¶ P53.) OMI did not ask for a written statement from Harding, and he was not interviewed by anyone other than Campbell. (<u>Id.</u> ¶ P68.)

When Bristow interviewed Mitchell, he denied "touching Witt in any sexually inappropriate way, denied making remarks to Witt regarding chocolate or Valentine's Day, and denied speaking with her outside the room where the patient was transferred." (<u>Id.</u> ¶ P77.) Bristow also looked into Mitchell's history, and concluded that Mitchell had no relevant or similar conduct to Witt's allegations. (<u>Id.</u> ¶ P79.)

When Bristow interviewed Witt, Witt related that "Mitchell placed both hands . . . near her vaginal area and her heels lifted off the ground," adding that she "bolted upright" and said, "Excuse me! What was that?" (<u>Id.</u> ¶¶ P57, P63.) Harding,

Garg, and Conroy, who witnessed the incident, however, did not hear Witt make this exclamation. (Id. ¶ 64.)

After Bristow completed her investigation, she drafted summaries of her interviews and submitted them to Kraus. (Id. ¶ D29.) On March 23, 2009, Kraus, who never interviewed Mitchell, wrote a summary report based on Bristow's interview summaries, and sent it to McCaughan. (Id. ¶¶ D30, P80.) Kraus's summary report stated that she believed "more likely than not" that Mitchell had inappropriately touched Witt. (Id.) In the summary report, Kraus deemed that Mitchell's denial of the alleged acts was not credible, because "[Mitchell] clearly was untruthful in the interview about making the two comments." (Id. ¶ P82.) Mitchell contends that in a standard OMI investigation Bristow would have written the summary report, and Kraus offered no explanation about why she wrote the summary report instead. (Id.) Kraus's summary report mentioned Witt's allegations, but failed to include that no witnesses heard Mitchell make the alleged statements or that Mitchell denied Witt's claims. (Id.)

### 3. Mitchell's Termination

Prior to the conclusion of OMI's investigation, on February 17, 2011, Bocian notified EMS District Chiefs and EMS Administration that Mitchell would be temporarily assigned to the 911 call center. (Id. ¶ P32.) Bocian testified that the assignment was "to remove him from having patient contact." (Pl.'s App., Ex. 2 ("Bocian Dep."), at 27, ECF No. 38.) Bocian, however, testified that there was nothing on Mitchell's record to indicate that he should have no contact with

patients. (CCS ¶ D36.) Mitchell contends that removing him from his regular duties "precluded him from earning extra monies for overtime work assignments previously available to him." (Id. ¶ D33.)

After OMI concluded its investigation, public safety director Huss asked Kraus whether or not Mitchell should be terminated. Kraus answered in the affirmative. (Id. ¶ P84.) Contrary to this conversation, Kraus testified at an arbitration hearing that she did not have any input in Mitchell's termination. (Id. ¶ P86.)

Bocian and McCaughan conferred with Marc Cherna ("Cherna"), director of the Allegheny County Department of Human Services, and Dr. Walter Smith ("Smith"), a clinical psychologist with the Western Pennsylvania Family Center, to see if Mitchell could be rehabilitated. (Id. ¶¶ D32, P88.) Cherna and Smith, who never interviewed Mitchell, asserted that Mitchell could not be rehabilitated because he would not admit to his behavior. (Id. ¶¶ P89, P94.) McCaughan recommended to Huss that Mitchell be terminated, and Huss approved the termination based upon McCaughan's recommendation. (Id. ¶ P95.) Huss knew that Mitchell was African American and "had no history of conduct of the nature of which he was accused." (Id. ¶ P96.)

On March 31, 2010, McCaughan and Bocian met with Mitchell and two union representatives. They told Mitchell that he could either retire or face termination; Mitchell refused to retire. (Id. ¶¶ D33, P97.) On April 8, 2010, defendants officially suspended Mitchell for five days pending termination. (Id. ¶¶ D34, P98.) On April 14, 2010, Mitchell was formally discharged as an employee of the City. (Id.)

### D. The City's Investigation and Discipline of Similar Incidents

Prior to the alleged incident, the City investigated two white paramedics who had been accused of striking patients. (Id. ¶ P127.) One of those paramedics was "LK." (Id.) LK wrote a special report describing the incident where he struck a female patient in the face, and caused a laceration on the inside of her mouth that required stiches. (Id. ¶ P132.) LK's special report stated that the female patient was highly combative, and had struck at LK with her fists. (Id.) A witness to the incident, a City police officer, adamantly told the OMI investigator that LK told him he had punched the patient in the face, which raised a credibility issue based on the contradictory statements in LK's special report. (Id. ¶ P133.) LK was not moved to a position without patient contact pending the investigation. (Id. ¶ P134.) In a taped interview during the investigation, LK told Kraus and the OMI investigator that he unintentionally struck the patient. (Id. ¶ P135.) LK denied telling the police officer that he had punched the patient. (Id.)

A few days later, LK was involved in a second incident where he allegedly struck a patient. (Id. ¶ P136.) This patient was a middle-aged male who was intoxicated, diabetic, and had a history of strokes. (Id. ¶ P137.) LK's defense for this incident was that the patient spit in his face; however, LK's partner told investigators that the patient "spit across the back of the ambulance after which LK slapped the patient across the face." (Id. ¶ P138.)

Kraus testified that OMI did not interview the patients whom LK struck because OMI "could not determine who the victims were in EMS cases because of

HIPAA, and so they could not interview these patients." (Id. ¶ P142.) Nevertheless, OMI sustained the allegations against LK. (Id. ¶ P139.) Bocian provided McCaughan with his opinion on discipline. (Id.) McCaughan did not consult with any psychologist about the likelihood that LK would strike another patient. (Id. ¶ P143.) McCaughan consulted with Huss, and McCaughan signed a letter to LK giving him a three-day suspension in lieu of a five-day suspension pending discharge for "conduct unbecoming as a result of several recent incidents where his 'behavior was called into question.'" (Id. ¶ P140.) LK was required to continue counseling and to attend and successfully complete an anger management program. (Id.)

The City investigated another incident in which a white paramedic ("TD") allegedly struck a patient. (Id. ¶ P145.) TD and his partner transported an intoxicated and combative patient to the hospital. (Id. ¶ P146.) A nurse reported seeing TD strike a patient. (Id. ¶ P147.) TD denied striking the patient. (Id. ¶ P151.) The OMI investigation elicited contradictory witness reports. (Id. ¶¶ P153, P158.) The investigators did not interview TD on tape, did not get an opinion about whether TD could be rehabilitated, and did not transfer TD to another position while the investigation was pending. (Id. ¶¶ P154, P155, P157.) McCaughan determined that results of the investigation did not merit discipline for TD. (Id. ¶ P158.)

In another incident, a woman alleged she was sexually propositioned by a white male City police officer ("AS"). (Id. ¶ P160.) The woman alleged that AS said

he would make a proposed traffic citation disappear if she complied with his sexual proposition. (Id.) OMI began an investigation into the alleged incident. (Id.) The investigation was an intensive inquiry into the complainant, her witnesses, and her employer by two OMI detectives. (Id. ¶ P162.) OMI conducted a taped interview with AS and reviewed the report of the incident submitted by AS. (Id.) OMI found AS not to be credible because he engaged in unsworn falsifications of one of the investigated issues. (Id. ¶ P163.) Even though OMI found AS to be not credible, OMI closed the file as unresolved, rather than sustained. AS was not disciplined for the incident. (Id.) OMI's investigation report described in detail the witness interviews, polygraph tests, and complainant's history. (Id. ¶ P164)

## III. Procedural History

Plaintiff filed a charge of discrimination with the EEOC and the Pennsylvania Human Relations Commission ("PHRC"). (Compl. ¶ 5, ECF No. 1.) After making a determination in favor of the plaintiff, the EEOC forwarded the charge to the U.S. Department of Justice, which issued plaintiff a Notice of Right to Sue on January 26, 2012. (Id. ¶¶ 6–7.) The instant complaint was filed on February 10, 2012. (Id.) Pending before the court is defendant's motion for summary judgment (ECF No. 25), which being fully briefed is now ready for disposition.

## IV. Standard of Review

Federal Rule of Civil Procedure 56 provides in relevant part:

> **(a) Motion for Summary Judgment or Partial Summary Judgment.** A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is

> sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court should state on the record the reasons for granting or denying the motion.

FED. R. CIV. P. 56(a), (c)(1)(A), (B).

> Rule 56 of the Federal Rules of Civil Procedure "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

Marten v. Godwin, 499 F.3d 290, 295 (3d Cir. 2007) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).

An issue of material fact is in genuine dispute if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see Doe v. Abington Friends Sch., 480 F.3d 252, 256 (3d Cir. 2007) ("A genuine issue is present when a reasonable trier of fact, viewing all of the record evidence, could rationally find in favor of the non-moving party in light of his burden of proof." (citing Anderson, 477 U.S. at 248; Celotex Corp., 477 U.S. at 322–23)).

> [W]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.

Scott v. Harris, 550 U.S. 372, 380 (2007) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986)).

In deciding a summary judgment motion, a court must view the facts in the light most favorable to the nonmoving party and must draw all reasonable inferences and resolve all doubts in favor of the nonmoving party. Woodside v. Sch. Dist. of Phila. Bd. of Educ., 248 F.3d 129, 130 (3d Cir. 2001); Doe v. Cnty. of Centre, 242 F.3d 437, 446 (3d Cir. 2001); Heller v. Shaw Indus., Inc., 167 F.3d 146, 151 (3d Cir. 1999). A court must not engage in credibility determinations at the summary judgment stage. Simpson v. Kay Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 643 n.3 (3d Cir. 1998).

## V. Discussion

### A. Title VII (Count I) and ADEA (Count II) Claims

When analyzing Title VII and ADEA employment discrimination claims, where no direct evidence of discrimination is presented, courts look to the framework developed by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).[2] The McDonnell Douglas framework calls for a three-step, burden-shifting analysis. The plaintiff has the initial burden to establish a prima facie case of discrimination, by satisfying all the elements set forth in McDonnell Douglas. Id. at 802. After the plaintiff establishes a prima facie case for discrimination, the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason" for the adverse employment action. Id. For the defendant to carry this burden, the defendant must "clearly set forth" a nondiscriminatory

---

[2] Although McDonnell Douglas was a Title VII case, the Court of Appeals for the Third Circuit applies the framework to cases brought under the ADEA. See Smith v. City of Allentown, 589 F.3d 684, 689 (3d Cir. 2009); Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108 (3d Cir. 1997). Accordingly, these claims are analyzed together.

reason. <u>Texas Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 255 (1981). If the defendant meets this burden, the burden shifts to the plaintiff to "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext of discrimination." <u>Id.</u> at 253 (citing <u>McDonnell Douglas</u>, 411 U.S. at 804).

For a plaintiff to establish a prima facie case under Title VII and the ADEA, the plaintiff must satisfy a four-part test, with the fourth element differing slightly between Title VII and the ADEA. To establish a prima facie case of unlawful employment discrimination in a termination or discipline case, the plaintiff must show (1) he belongs to a protected class, (2) he was qualified for the position, (3) he was subjected to an adverse employment action, such as termination, and (4) the circumstances of the adverse action "give rise to an inference of unlawful discrimination." <u>Id.</u> The fourth prong can be established with respect to a Title VII claim by showing that similarly situated individuals who were not members of the protected class were more favorably treated than the plaintiff. <u>Nguyen v. AK Steel Corp.</u>, 735 F. Supp. 2d 346, 361 (W.D. Pa. 2010) (citing <u>Jones v. Sch. Dist. of Phila.</u>, 198 F.3d 403, 410–11 (3d Cir. 1999)). With respect to an ADEA claim, the fourth prong is established by showing that the plaintiff was replaced by someone sufficiently younger to support an inference of age discrimination. <u>Smith v. City of Allentown</u>, 589 F.3d 684, 689 (3d Cir. 2009).

The first three prongs of this test are not in dispute. (Defs.' Br. 9, ECF No. 27.) Mitchell is African American and more than forty years old; therefore, he is a

member of a protected class under Title VII (race) and the ADEA (age). Defendants regarded Mitchell as an average employee, which satisfies the qualification element. Mitchell was subjected to an adverse employment action when he was terminated. The remainder of this discussion, with respect to plaintiff's burden of establishing a prima facie case, will address the fourth prong of the test.

## 1. Fourth Prong of a Prima Facie Case Under Title VII

Plaintiff must establish that the circumstances of his termination give rise to an inference of unlawful discrimination to satisfy the fourth prong of the prima facie case. Burdine, 450 U.S. at 253. The plaintiff's burden at the prima facie stage is "not onerous." Id. To satisfy this burden, plaintiff argues that the City treated similarly situated employees outside the protected class more favorably by disciplining them less harshly for similar conduct. Plaintiff points to three City employees as comparators: AS, a white police officer, and LK and TD, white paramedics. (Pl.'s Br. 2, 17, ECF No. 35.) The City argues that plaintiff failed to carry the burden of his prima facie case because none of these three employees was similarly situated with plaintiff. (Defs.' Br. 9.)

To be valid comparators, employees need not be "identically situated," but they must be similar in "'all relevant respects.'" Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 223 (3d Cir. 2009) (quoting Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir. 1997)). In determining whether employees are similarly situated, the court is required to undertake "a fact-intensive inquiry based on a whole constellation of factors." Monaco v. Am. Gen. Assurance Co., 359 F.3d 296, 306 (3d Cir. 2004)

14

(interpreting New Jersey antidiscrimination law). Some of the factors to be considered are whether "'the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in *similar* conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them.'" McCullers v. Napolitano, 427 F. App'x 190, 195 (3d Cir. 2011) (per curiam) (emphasis added) (quoting Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617–18 (7th Cir. 2000)).[3] Employees are not similarly situated when one of the employees "holds a different job in a different department." Mandel v. M & Q Packaging Corp., 706 F.3d 157, 170 (3d Cir. 2013). The proposed comparators must have engaged in conducted of "comparable seriousness." Nguyen v. AK Steel Corp., 735 F Supp. 2d 346, 361 (W.D. Pa. 2010) (internal quotation marks omitted).

Under this standard, plaintiff and AS are not similarly situated because, as a police officer, AS worked in a different job for a different department. In terms of employment, plaintiff is similarly situated to City paramedics TD and LK. As

---

[3] Other courts have demanded that comparators' conduct be "the same." E.g., Hodczak v. Latrobe Specialty Steel Co., 761 F. Supp. 2d 261, 269 (W.D. Pa. 2010) ("'[Comparators] . . . must have dealt with the same supervisor, have been subject to the same standards and have engaged in *same* conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" (quoting Ogden v. Keystone Residence, 226 F. Supp. 2d 588, 603 (M.D. Pa. 2002)) (emphasis added)). The court concludes that "similar conduct" is the more appropriate formulation, and the one relied upon more often and more recently by Court of Appeals for the Third Circuit—albeit in unpublished opinions. See Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617–18 (7th Cir. 2000), quoted favorably by Brown v. SEPTA, No. 13-2467, 2013 WL 4804381, at *3 (3d Cir. Sept. 10, 2013) (per curiam); Amfosakyi v. Frito Lay, Inc., 496 F. App'x 218, 224 (3d Cir. 2012) (per curiam); McCullers v. Napolitano, 427 F. App'x 190, 195 (3d Cir. 2011) (per curiam); Houston v. Easton Area Sch. Dist., 355 F. App'x 651, 654 (3d Cir. 2011); Opsatnik v. Norfolk S. Corp., 335 F. App'x 220, 223 (3d Cir. 2009). But see Davis v. City of Phila. Water Dep't, 57 F. App'x 90, 92 (3d Cir. 2003) (using the "the same conduct" formulation (quoting Anderson v. Haverford Coll., 868 F. Supp. 741, 745 (E.D. Pa. 1994))).

paramedics and EMS employees, all three were subject to the same standards and were supervised by McCaughan and Bocian. Defendants argue, however, that TD and LK are not similarly situated to plaintiff with respect to their alleged misconduct.

TD was investigated for allegedly striking a patient, but McCaughan concluded that the evidence did not support imposing discipline. The lack of actionable evidence is a mitigating circumstance that prevents TD from being similarly situated to plaintiff. <u>Moussa v. Pa. Dep't of Pub. Welfare</u>, Civil Action No. 07-9, 2010 WL 1333333, at *10 (W.D. Pa. Mar. 31, 2010) (finding that plaintiff and comparator were not similarly situated where plaintiff's misconduct was substantiated and the allegations of misconduct by comparator were "unfounded").

LK was suspended for three days and ordered to attend an anger management program for striking two patients while on duty. Plaintiff argues that striking patients and grabbing a coworker's buttocks are similar conduct because they both "constitute unacceptable offensive physical contact." (Pl.'s Br. 5.) Defendants argue that plaintiff's conduct is distinguishable because it involved sexual harassment and violated the City's no discrimination/no harassment/no retaliation ("DHR") policy. (Defs.' Br. 10.) Defendants assert that LK admitted wrongdoing while Mitchell maintained his innocence. (<u>Id.</u> at 12.)

After viewing all evidence in the light most favorable to plaintiff, the court concludes that a reasonable fact finder could find that plaintiff and LK are similarly situated in all relevant respects, including their alleged misconduct. The conduct at

issue here—grabbing a coworker's buttocks—and the conduct involving LK—striking a patient—are of "comparable seriousness." Although the City chose not to terminate LK, he was found to have engaged in unbecoming conduct. (Bocian Dep., Ex. 6, Letter to LK.) The record reflects that unbecoming conduct is a terminable offense because LK's suspension was "in lieu" of discharge. (Id. (suspending LK for three days and requiring counselling and completion of an anger management program "in lieu of a five day suspension pending discharge for conduct unbecoming")); see Cange v. Phila. Parking Auth., Civil Action No. 08-3480, 2009 WL 3540784, at *9 (E.D. Pa. Oct. 30, 2009) (finding that sleeping and loafing on the job constituted similar conduct because both were punishable by termination under the employer's code of conduct). There is no requirement that two employees be disciplined under the identical policy to be found similarly situated. See Smith v. Walgreens, Civil Action No. 12-26, 2013 WL 4041501, at *10 (D. Del. Aug. 1, 2013) (finding that a reasonable fact finder could conclude that two employees were similarly situated where one employee was disciplined under a policy against workplace violence and the other employee was disciplined under a policy against workplace harassment and discrimination).

LK admitted he slapped one patient, but he denied intentionally striking another and denied telling a police officer that he had punched that patient. The finder of fact could reasonably conclude in this case that LK did not accept responsibility for the conduct in issue in his discipline. Plaintiff admitted touching the coworker's waist area but denied grabbing her buttocks and making comments

about Valentine's Day or chocolate. Plaintiff did not accept responsibility for the conduct in issue in his discipline. Because plaintiff did not admit to the statements or offensive touching, McCaughan and Bocian concluded after talking to Cherna and Smith that plaintiff was not a suitable candidate for counseling and rehabilitation.[4] (CCS ¶ P94.) LK, however, was permitted to remain on the job with counseling. McCaughan and Bocian did not consult with any mental health professionals about whether LK could be rehabilitated. (CCS ¶ P143.)

LK, after engaging in conduct that a rational jury could find was similar to plaintiff's conduct, was suspended for three days and given counseling, while plaintiff was terminated. A reasonable jury might conclude that these circumstances give rise to an inference of discrimination. Plaintiff, therefore, adduced sufficient evidence to support a prima facie case under Title VII.

### 2. Fourth Prong of a Prima Facie Case Under the ADEA

The forth element of a prima facie case of age discrimination under the ADEA is that plaintiff was "replaced by a sufficiently younger employee to support an inference of age discrimination." Burton v. Teleflex Inc., 707 F.3d 417, 426 (3d Cir. 2013). Plaintiff did not offer any evidence that he was replaced by a younger employee. Therefore, plaintiff has not satisfied the fourth prong of a prima facie case under the ADEA, and the City's motion for summary judgment will be granted with respect to the ADEA claim.

---

[4] There was some testimony that plaintiff's alleged violation of the City's DHR policy was a "zero tolerance situation." (Kraus Dep. 115.) The record reflects that McCaughan and Bocian solicited opinions concerning whether plaintiff could be rehabilitated and contemplated a punishment short of termination, which creates a triable issue with respect to whether it was a "zero tolerance situation." (See Bocian Dep. 58:6–63:18.)

### 3. Legitimate, Nondiscriminatory Reason for Termination

After a plaintiff establishes a prima facie case, the defendant must articulate a legitimate, nondiscriminatory reason for its action. The burden of production is light. "The employer need not prove that the tendered reason *actually* motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff." Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994). The City alleges that it terminated plaintiff for engaging in sexually inappropriate conduct that violated the City's DHR policy. (Defs.' Br. 14.) A violation of workplace conduct policy is a legitimate, nondiscriminatory reason for termination. Raytheon Co. v. Hernandez, 540 U.S. 44, 51–52 (2003). Here, the City met this burden by "explaining clearly the nondiscriminatory reason . . . for its action." Burdine, 450 U.S. at 260.

### 4. Pretext

Because the City met its burden of production by showing a legitimate, nondiscriminatory reason for plaintiff's termination, the burden shifts to plaintiff to demonstrate that the employer's alleged reasons are pretext for discrimination. Id. For the plaintiff to meet this burden, the plaintiff must show "'*both* that the reason was false, *and* that discrimination was the real reason.'" Fuentes, 32 F.3d at 763 (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993)). To survive a motion for summary judgment, a plaintiff must satisfy at least one of the two prongs formulated by the United States Court of Appeals for the Third Circuit in Fuentes:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

Id. at 764. Here, each prong will be discussed.

### a. Prong One

To satisfy the first prong of the pretext analysis, "the non-moving plaintiff must demonstrate . . . weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder *could* rationally find them 'unworthy of credence.'" Fuentes, 32 F.3d at 765 (quoting Ezold v. Wolf, Block, Schorr & Solis-Cohen, 983 F.2d 509, 531 (3d Cir. 1992)). A plaintiff may not "'simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.'" Keller v. Orix Credit Alliance, Inc., 130 F.3d 1101, 1108–09 (3d Cir. 1997) (quoting Fuentes, 32 F.3d at 765). A plaintiff need not necessarily, however, produce additional evidence beyond that required by the prima facie case. Fuentes, 32 F.3d at 764.

Plaintiff contends that the City failed to follow the normal investigative procedures in pursuing the allegations against him, weakening the City's claim of a legitimate, nondiscriminatory reason for termination. (Pl.'s Br. 14.) Plaintiff points to the fact that the OMI investigator never taped Witt's interview or the witnesses' interviews, never asked any witness to sign a written statement, and never

investigated the credibility of Witt or the witnesses. "Departures from the normal procedural sequence . . . might afford evidence that improper purposes are playing a role." Vill. of Arlington Heights v. Metro. Hous. Dev. Corp., 429 U.S. 252, 267 (1977).

Plaintiff offered evidence that in the investigation of the allegations against AS, the City took a taped statement from the complainant, investigated the complainant's background, subjected the complainant to a polygraph examination, and conducted in-person interviews with witnesses. As noted above, however, AS is not a similarly situated comparator. Plaintiff did not come forward with any evidence showing that the investigation of LK followed the same procedures or so thoroughly investigated the witnesses, and the investigation of LK ultimately sustained the allegations against him. There is no basis for concluding that the City's investigation of plaintiff departed from the normal procedural sequence with respect to investigations of EMS employees accused of offensive physical conduct. Plaintiff did not satisfy the burden of showing that the City's legitimate reason for termination was pretext under the first prong of the Fuentes pretext analysis.

### b. Prong Two

To satisfy the second prong of the pretext analysis, the plaintiff must adduce evidence "that proves . . . discrimination in the same way that critical facts are generally proved—based solely on the natural probative force of the evidence." Keller, 130 F.3d at 1111. Plaintiff can satisfy the second prong with evidence in one of three categories: "that the employer in the past had subjected him to unlawful

discriminatory treatment, that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons." <u>Fuentes</u>, 32 F.3d at 765.

Plaintiff offered no evidence that the City discriminated against him prior to the investigation of the incident on February 14, 2010. Plaintiff adduced evidence under the second and third categories, asserting that (1) the City treated similarly situated persons not of the protected class more favorably and (2) the City discriminated against other African-American EMS employees by disciplining them at a higher rate than white employees.

As noted above, a reasonable fact finder could determine that Mitchell and LK were similarly situated. Because Mitchell was terminated while LK was only suspended for three days, the finder of fact could infer that defendants' stated reason for Mitchell's termination was pretext and that discrimination was more likely than not the actual reason for termination. Because this satisfies the second prong of <u>Fuentes</u>, the court need not address whether the evidence with respect to an alleged higher rate of discipline for African Americans would permit an inference of discrimination and pretext.

Defendants' motion for summary judgment, with respect to the Title VII claim, will be denied.

## B. PHRA Claims (Count III)

Although defendants' motion for summary judgment did not address plaintiff's PHRA claims directly, the PHRA is interpreted as identical to federal antidiscrimination laws, and PHRA claims can be addressed coextensively with Title VII and the ADEA. Burton v. Teleflex Inc., 707 F.3d 417, 432 (3d Cir. 2013). Therefore, summary judgment will be granted with respect to the claims based on age discrimination and denied with respect to the claims based on racial discrimination.

## C. § 1983 Claims (Count IV)

Plaintiff asserted claims of racial discrimination in violation of the Equal Protection Clause under 42 U.S.C. § 1983 against the City[5] and against Huss,[6] McCaughan, Bocian, and Kraus in their personal and official capacities. Claims against individual defendants in their official capacities are treated as claims against the municipality. McGreevy v. Stroup, 314 F.3d 359, 369 (3d Cir. 2005). To establish a violation of the Equal Protection Clause, a plaintiff must prove that a defendant acted with discriminatory intent. Andrews v. City of Phila., 895 F.2d 1469, 1478 (3d Cir. 1990). The McDonnell Douglas framework applies to discrimination claims under 42 U.S.C. § 1983. Stewart v. Rutgers, The State Univ.,

---

[5] Because defendants' motion for summary judgment did not address the City's liability under § 1983, the court did not consider the issues surrounding municipal liability under Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978), and its progeny. The claim against the City therefore survives summary judgment.

[6] The court notes that Huss was not named in Count IV of the complaint. The briefing of defendants and plaintiff assumed that the § 1983 claim was asserted against him, and the court followed this assumption. Because the court is granting the motion for summary judgment with respect to the claims against Huss, the failure to include Huss by name in the heading or allegations of Count IV is moot.

120 F.3d 426, 432 (3d Cir. 1997); see also St. Mary's, 509 U.S. at 506 n.1 (assuming applicability of McDonnell Douglas framework to 42 U.S.C. § 1983).

Defendants moved for summary judgment only for the § 1983 claims asserted against the individual defendants. Each individual defendant must be separately addressed.

### 1. McCaughan and Bocian

Defendants argue that there is no evidence that McCaughan or Bocian acted with discriminatory intent in deciding to terminate plaintiff. As discussed above, when viewing the facts in the light most favorable to plaintiff, there is sufficient circumstantial evidence for a jury to draw an inference of discrimination in this case. McCaughan and Bocian supervised plaintiff. They discussed the incident repeatedly from the time of the allegation until the decision to terminate was made. McCaughan recommended to Huss that plaintiff be terminated. McCaughan and Bocian also supervised comparator LK. McCaughan, with Bocian's input, determined the appropriate level of discipline for LK and recommended suspension to Huss. Because of the different treatment, a jury could infer that intentional discrimination occurred. Defendants' motion for summary judgment will be denied with respect to McCaughan and Bocian.

### 2. Huss

Defendants argue that there is no evidence that Huss, who oversaw McCaughan's personnel decisions, was personally involved in decision to terminate plaintiff or had any reason to believe that his subordinates acted with

discriminatory intent. Section 1983 liability cannot be predicated on *respondeat superior*; instead, "there must be some affirmative conduct by the supervisor that played a role in the discrimination." Andrews, 895 F.2d at 1478. This affirmative conduct may be shown through direct evidence of discrimination by the supervisor or actual knowledge of discrimination and acquiescence, either of which must be proven with "appropriate specificity." Id.

The record reveals that, while Huss discussed the matter with McCaughan and Kraus, he was not involved in the decision outside of ratifying McCaughan's decision to terminate plaintiff based on the OMI investigation. No evidence indicates that Huss acted with discriminatory intent or had actual knowledge of discrimination by subordinates. Accordingly, no reasonable jury could render a verdict in favor of plaintiff and against Huss on this claim, and defendants' motion for summary judgment will be granted with respect to defendant Huss.

### 3. Kraus

As director of OMI, Kraus did not supervise plaintiff. Plaintiff asserts that she may nevertheless be subject to § 1983 liability under a "cat's paw" theory, in which a subordinate employee with unlawful motives dupes the formal decision maker into making a discriminatory employment action. Plaintiff argues that Kraus conducted a flawed and biased investigation that caused Huss, McCaughan, and Bocian to terminate plaintiff. A number of circuit courts of appeals have indicated that the cat's paw theory supports finding subordinate governmental employees liable under § 1983 when they cause the actual decision maker to retaliate. See

Smith v. Bray, 681 F.3d 888, 898 (7th Cir. 2012).[7] The court need not address whether the cat's paw theory applies in this context as there is no evidence that Kraus acted in a discriminatory manner.

Plaintiff paints the OMI investigation of plaintiff overseen by Kraus as biased because it was not as thorough as the OMI investigation of AS. As noted above, AS and plaintiff were not similarly situated, and these investigations cannot be compared for purposes of drawing an inference of unlawful discrimination. Although OMI's investigation of plaintiff and the report, written by Kraus, may be flawed, this alone is not evidence of intentional discrimination. Fuentes, 32 F.3d at 765 ("[T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."). With respect to the investigation of LK, in which Kraus participated, OMI sustained the allegations against him. OMI sustained the allegations against both plaintiff and LK. McCaughan and Bocian, not Kraus or OMI, determined that plaintiff and LK would receive differing levels of discipline. On the record before the court, no reasonable jury could find that Kraus intentionally discriminated against plaintiff. Defendants' motion for summary judgment will be granted with respect to the claims against Kraus.

## VI. Conclusion

For the reasons described above, defendants' motion for summary judgment is granted in part and denied in part. The motion for summary judgment is granted

---

[7] The Court of Appeals for the Third Circuit has not addressed this issue.

with respect to the ADEA claim, PHRA claims based on age discrimination, and all claims against Huss and Kraus. The motion is denied with respect to all other claims. An appropriate order will be entered.

Dated: January 17, 2014                    By the court:

                                           /s/ JOY FLOWERS CONTI
                                           Joy Flowers Conti
                                           Chief United States District Judge